Alexander Hernaez (SBN: 201441)
ahernaez@foxrothschild.com
Lucy Li (SBN: 305613)
lli@foxrothschild.com
FOX ROTHSCHILD LLP
345 California Street, Suite 2200
San Francisco, CA 94104
Telephone: 415.364.5540
Facsimile: 415.391.4436

Attorneys for Defendant
TESLA, INC., (erroneously sued as TESLA
MOTORS, INCORPORATED)

# UNITED STATED DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| WALTER HIDALGO, | Case No.: 5:15-cv-05185-BLF |
|---|---|
| Plaintiff, | |
| v. | **JOINT UPDATE RE: STATUS OF ARBITRATION** |
| TESLA MOTORS, INC., a Delaware corporation; and DOES 1 through 25, inclusive, | [Re: ECF 55] |
| Defendants. | |

**STATUS UPDATE**

Plaintiff Walter Hidalgo and Defendant Tesla, Inc. (collectively the "Parties") hereby submit the following Status Update in accordance with this Court's May 28, 2020 Order Requesting Joint Further Status Report Re Arbitration (ECF 55).

## I.   CURRENT STATUS

The Parties conducted the arbitration in this matter before Michael J. Loeb, Esq. of JAMS ("the Arbitrator") in San Francisco, CA from December 16 through December 19, 2019. The Parties submitted their closing briefs to the Arbitrator in May 2020.  The Arbitrator issued his written Final Award on July 31, 2020, where he found that Plaintiff Walter Hidalgo failed to meet his burden to prove all of his causes of action.  A copy of the Arbitrator's Award is attached hereto as **Exhibit A**.

## II.   FURTHER ACTION

Defendant Tesla, Inc. intends to file a Motion to Confirm the Arbitration Award shortly. The Parties respectfully request that this Court set the next status conference or hearing for after September 2020 so the Parties may file the appropriate documents for the above referenced motion.

Respectfully submitted by:

Dated: August 14, 2020                                    **FOX ROTHSCHILD LLP**

By:  /s/ *Lucy Li*
                                                                    Alexander Hernaez
                                                                    Lucy Li
                                                                    Attorneys for Respondent Tesla, Inc.

1

1

Dated: August 14, 2020                              **STEPHAN FILIP PC**

2

3                                           By: _/s/ Shahane A. Martirosyan_
                                                 Shahane Arayi Martirosyan
4                                                Attorney for Plaintiff
                                                 Walter Hidalgo

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT UPDATE RE: STATUS OF ARBITRATION                    Case No.: 5:51-cv-05185-BLF
Active\113263461.v1-8/14/20

# EXHIBIT A

Michael J. Loeb, Arbitrator
JAMS
2 Embarcadero Center
Suite 1500
San Francisco, CA 94111
Tel: (415) 982-5267
Fax: (415) 982-5287

## JAMS ARBITRATION NO. 1100085655

| | |
|---|---|
| WALTER HIDALGO, | |
|        Claimant, | **FINAL AWARD** |
| vs. | |
| TESLA MOTORS, INC., | |
|        Respondent. | |

**Counsel:**

Shahane Maritrosyan Esq.
STEPHAN FILIP PC
100 W. Broadway
Suite 1040
Glendale, CA 91210

Alexander Hernaez Esq.
Lucy Li
FOX ROTHSCHILD LLP
345 California Street
Suite 2200
San Francisco, CA 94104

Matthew E. Faler Esq.
CONSUMER ACTION LAW GROUP, P.C.
3700 Eagle Rock Blvd.
Los Angeles, CA 90041

Attorneys for Claimant
WALTER HIDALGO

Attorneys for Respondent
TESLA MOTORS, INC.

## I.    INTRODUCTION

On June 29, 2016, the United States District Court for the Northern District of California issued an order finding the arbitration agreement between Claimant, Walter Hidalgo ("Claimant" or "Hidalgo") and Respondent, Tesla Motors, Inc. ("Respondent" or "Tesla") valid and concluding that the agreement encompassed the claims brought by Hidalgo against Respondent in his lawsuit. As such, the court issued an order compelling arbitration of Hidalgo's claims against Tesla. The parties' arbitration agreement specifically stated that "any and all disputes . . . arising from or relating to [Hidalgo's] employment, or the termination of [his] employment, will be resolved . . . by the Judicial Arbitration and Mediation Services/Endispute, Inc. ("JAMS") . . . under the then current rules of JAMS for employment disputes."

On October 19, 2018, Hidalgo submitted an Amended Claim for Damages with JAMS. Those claims included: (1) violation of Cal. Gov. Code §12940(a) (based on age and race); (2) intentional infliction of emotional distress; (3) violation of Cal. Gov. Code §12940(n) – failure to engage in the interactive process; (4) violation of Cal. Gov. Code §12940(m) – failure to provide reasonable accommodation;[1] (5) wrongful termination in violation of public policy; and (6) violation of Cal. Labor Code §1102.5. An arbitration hearing was held before me from December 16-19, 2019 at the San Francisco office of JAMS. At that hearing Hidalgo was represented by counsel Shahane Martirosyan and Stephan Airapetian of Stephan Filip, PC and Matthew Faler and Charles Panzarella of the Consumer Action Law Group, PC. Tesla was represented by counsel Alexander Hernaez of Fox Rothschild, LLP who was supported by

---

[1] On June 23, 2019, I issued a Case Management Order in which I indicated that I would not be changing my previous order from November 26, 2018 dismissing Hidalgo's disability-based claims based on the parties' express agreement.  Further, there were numerous discovery disputes during the course of this litigation requiring me to issue orders as well as a motion to continue the arbitration hearing, which I granted  based on the physical condition of Claimant's co-counsel. In sum, this was a hard fought, contentious case.

paralegal Egor Isaichev. Also present during the arbitration hearing were Tesla representatives Jamie Dobiford and Jennifer Nguyen.

At the arbitration hearing, the following witnesses testified:

(1) Nick Tabak
(2) Kyle Rowe
(3) Kathleen Hidalgo
(4) Laura Grose
(5) Walter Hidalgo
(6) Christopher Gross
(7) Krista Washington

I should note that I found all of these witnesses to be both compelling and credible, particularly so with regard to the testimony of Mr. Hidalgo and Mr. Tabak. Thus, my decision in this case is not based on the credibility of any one witness over another. It is instead based on the strength of the evidence that was presented and whether or not the parties have submitted sufficient evidence to meet their respective burdens of proof.

Numerous exhibits were also introduced and accepted into evidence at the hearing.

The parties submitted pre-hearing briefs on December 6, 2019. Tesla submitted its post-arbitration brief on April 30, 2020, and on May 20, 2020, Hidalgo submitted his post-arbitration brief. Hidalgo seeks $757,017.00 in economic damages ($383,646 for lost earnings and benefits and $373,371 for lost stock options), $250,000 in non-economic damages, and $1,000,000 in punitive damages.

Having read and considered the parties' arguments in their papers and heard and considered their arguments, as well as the oral and documentary evidence, introduced at the arbitration hearing, I herein issue the following Final Arbitration Award.[2]

## II.   FACTS[3]

On November 20, 2012, Tesla offered Hidalgo the exempt, salaried position of Manufacturing Engineer at its Fremont, California factory with a salary of $85,000 per year.[4] (Ex. 4.) Tesla's Model S began production on a static production line at the Fremont factory that same year. The Fremont factory is the only factory in California that produces and assembles cars.

When he was first hired, Hidalgo's supervisor was Mark Cuyler, Manufacturing Engineering Manager. Nick Tabak ("Tabak") became Hidalgo's supervisor around October, 2013. Hidalgo's main job duties were, *inter alia*, to develop and design manufacturing equipment and fixtures to support early stage prototype builds and for medium and high-volume production. He was also hired to develop new manufacturing processes and to create detailed manufacturing instructions to support those processes, and he was to perform process analysis and capacity modeling and implement product traceability and shop floor tracking. For processes that Hidalgo did not design himself and that he instead may have inherited, Hidalgo was responsible for identifying any issues with those processes and then correcting them. (Tabak Depo., 161:14-18.) All in all, according to Tabak, Hidalgo was responsible for conducting a root

---

[2] This Award is final because neither party is seeking its costs and/or fees associated with this matter; thus, there are no outstanding issues to be resolved once this Award is issued.

[3] The facts that follow are necessary to this Final Award. They are derived from admissions in the pleadings and the testimony and evidentiary exhibits presented at the hearing. To the extent that any of these findings differ from any party's position, that is the result of my determinations as to credibility and relevance, burden of proof considerations, legal principles, and the weighing of the evidence, both oral and written.

[4] Prior to working at Tesla, Hidalgo had 40+ years of experience as an engineer. (Tr. Hidalgo, 666:11-743:4.)

cause analysis when any manufacturing/production problems arose, which involved identifying the problem, quantifying the problem, boiling the problem down to one or two actions that needed to be taken to solve the problem, formulating a written action plan to address contributing factors and auditing the procedure to ensure that the appropriate results are achieved. (Tr. Tabak, 503:24-505:21; 493:23-496:9.)

While employed at Tesla, Hidalgo was primarily responsible for Chassis 3.[5] (Tr. Tabak, 172:19-173:9.) He was responsible for troubleshooting any issues pertaining to equipment that related to Chassis 3 and for resolving those issues as they related to safety, quality, productivity and cost. (*Id.*, 178:2-21.) Hidalgo worked closely with Tesla's maintenance department to maintain the equipment Tesla used to manufacture its vehicles. Hidalgo, as the Manufacturing Engineer, would assess the risk, understand what direction to take, and provide direction to the maintenance worker. The maintenance worker would then do what the engineer asked him or her to do. (Tr. Tabak, 598:4-599:6; 184:6-186:16.)

In 2014, Tesla made the decision to build a dynamic assembly line at the Fremont factory. Dynamic assembly lines meant that the cars would be moving through the stations. To build the dynamic assembly line, many of the engineers who worked on the static line were transferred. Hidalgo was not transferred, however; he remained on the static assembly line.

Hidalgo testified that there was inadequate staffing of engineers throughout his tenure, particularly between December, 2014 until his termination in February, 2015. This testimony was corroborated by the deposition testimony of Mark Kalisch ("Kalisch"), Hidalgo's lead, who also reported to Tabak. Kalisch testified that, during the relevant time period, the manufacturing

---

[5] A chassis is the skeletal framework or underbody of a vehicle on which most of the mechanical parts like tires, axle assemblies, steering, brakes and the engine are fastened. (Tr. Tabak, 177:9-24.) At Tesla, the chassis line is split into three – Chassis Lines 1, 2 and 3 – and a series of operations would take place on those lines to manufacture and/or assemble the Model S at that time. (*Id.*) Hidalgo worked primarily on Chassis 3 but also had some involvement in other chassis lines, particularly when staffing issues arose. (Tr. Hidalgo, 921:20-922:13.)

engineers were "lacking in the support for the assembly line." Kalisch testified that he would have liked to have seen fifteen manufacturing engineers on the line, but there were only four, and then two of those engineers were moved to the Model X project sometime after Thanksgiving of 2014, so at that point it was just Hidalgo and him. (Kalisch Depo., 31:3-32:25; 44:8-48:24.)

Tabak gave Hidalgo several verbal warnings during his tenure at Tesla. First, Tabak issued a verbal warning for failing to respond to issues with tooling in a timely manner, which resulted in increased physical stress to employees who were working in the rear suspension line. (Tabak Depo, 42:5-22.) He later gave him a verbal warning about how to ensure productivity targets as Tesla ramped up production. (*Id*., 51:18-21.) Tabak also found Hidalgo remiss in meeting project deadlines. For example, when there was a problem with the ergonomic issues in Chassis 3, Tabak did not believe that Hidalgo fulfilled his role as a manufacturing engineer to decide what he was going to do to fix the issues and set a deadline for doing it. (*Id*, 176:11-24.) Tabak also believed that Hidalgo was not "using any tools. He did not provide any sort of sound engineering rationale or logical thought to define [] problems, to identify a root cause, and actually effectively put in countermeasures or actions that would negate [] issues from coming up." (*Id*., 187:18-23.) And in one instance, during preproduction, when Tesla's safety team and a third-party auditor audited the shop for safety compliance and found a problem with the safety gate barrier in Hidalgo's area that was meant to protect a person from falling from one of the elevated areas to a lower area, Hidalgo failed to correct the deficiency in two days, despite Tabak asking him to do so. Instead, Tabak corrected the deficiency himself. (*Id*., 232:3-233: 25.) Hidalgo's lack of follow through on various projects, tasks and needs was documented in numerous other instances. (*See* Ex. 3 [Hidalgo not getting work done despite follow ups over several weeks); Ex. 4 [failure to install a guardrail]; Ex. 5 [failure to fix issue with "reaction force" on tool].)

Tabak also testified that he believed that Hidalgo did not think like an engineer and that he did not create action plan records when necessary. Hidalgo reasonably disputed this contention, however, testifying that, while he did not write down the word "action plan" when he was assessing a problem and deciding what actions needed to be taken to address that problem, he always went through the mental process of formulating an action plan based on his decades of engineering experience when a problem was placed before him. (*See* Tr. Hidalgo, 820:16-821:4.) It would have been impossible to actually take the time to sit and write down an action plan, Hidalgo explained, because he was already working extended hours and writing his plan down would mean he would not have had the time to do the work itself. (*Id.*)

Tabak's concerns about Hidalgo's performance were documented in Hidalgo's performance review. (Ex. 501.) In that review Tabak outlined a Development Plan/Areas for Improvement for Hidalgo and gave him ratings of 1's and 2's out of 5. (*Id.*)[6] Hidalgo noted in the review that one of his goals for his future at the company was to "[s]urvive without killing myself with excessive work hours . . . . "

By the last quarter of 2014, Tabak believed that Hidalgo's performance had failed to improve.[7] Around this same time period, one of Tesla's production associates was struck in the face with the Chassis 3 tool assist arm because, Tabak believed, Hidalgo did not timely resolve safety issues. (Tr. Tabak, 570:9-20.) As such, Tabak issued Hidalgo a PIP on or about December 15, 2014, which extended until January 23, 2015. Hidalgo signed and acknowledged the PIP at

---

[6] There was some confusion about the proper date of Hidalgo's performance review document. The testimony was undisputed that Tesla rolled out the performance evaluation process in June, 2014, but the performance review was titled "2013 Performance Evaluation." Further, the performance review stated that it was last edited by Tabak in June, 2015, months after Hidalgo's termination. This date was explained away as a "system typo" or as an error that resulted from HR's switch from the ADP information system to Workday. (Tr. Martirosyan, 417:6-24; Washington, 807:23-808:8.) I accept this explanation and reject the contention that this evaluation was created after the fact.

[7] Notably, this was around the same time frame that, according to Hidalgo and Kalisch, the assembly line was understaffed with engineers.

that time.[8] (*See* Exs. 6, 7.) The PIP was designed to help Hidalgo improve his performance and clearly outlined what was expected of him. It required Hidalgo to demonstrate "immediate and sustained improvement in the following areas": (1) ergonomic / quality issues; (2) productivity / bottleneck analysis; (3) pre-trim 3 process set up; (4) torque NOK ("not okay") condition reduction;[9] and (5) Tesla production support.

Hidalgo was advised that failure to accomplish the tasks during the specified timeframe would lead to disciplinary action up to and including termination. (*See* Ex. 7.) Tabak periodically reviewed Hidalgo's progress and audited the data for evidence of improvement. (Tr. Tabak, 247:23-248:4.) He also had informal discussions with Hidalgo about his performance. Hidalgo testified, however, that those conversations never occurred. (*See* Tr. Hidalgo, 891:121-892:20.) In any event, no evidence was introduced demonstrating that any discussions about Hidalgo's progress on his PIP occurred during any regularly scheduled sit-down meetings between Tabak and Hidalgo in which notes of the conversations were contemporaneously made. Instead, during the six-week period covered by the PIP, Tabak only took notes regarding Hidalgo's progress in his daily planner, after which he transferred those notes into the "Notes" section of the PIP. (*See* Ex. 7; Tabak Depo., 302:13-303:15; Tr. Washington, 781:1-15 [confirming that it was Tesla's policy that managers could document progress during the PIP and give HR the notes at the end of the PIP, as Tabak had done]) As outlined in the "Notes" and "Performance History" sections of the PIP, Hidalgo failed to improve his performance over these six weeks. (*See id.*; *see also*

---

[8] At the arbitration hearing, Hidalgo challenged the authenticity of the PIP, mainly because it was not stored in his personnel file. I have no doubts about the PIP's authenticity, however. Tesla produced the Declaration of Colin Sacs authenticating the PIP, and it produced a metadata report of the PIP and the e-mail to which it was attached. (*See* Ex. 661.) These documents satisfactorily demonstrate that the PIP – exhibit 505 – was last edited on February 18, 2015, the date of Hidalgo's termination. (*See also* Tr. Gross, 769:22-770:10 [testifying that he received a copy of the PIP before Hidalgo's termination].)

[9] A torque NOK refers to when a tool is not doing its defined tasks correctly, so it results in a "not-okay" condition. (Tabak Depo., 170:3-12.) Tesla HR kept track of how many NOKs were generated by each engineer.

Tesla Br., 4/30/2020, pp.7-10 [detailed citations to record of ways in which Hidalgo had not met the expectations of his PIP].)

During the same time period as Hidalgo's PIP, Tabak assigned Hidalgo new duties. For example, the week of January 19, 2015, Tabak required Hidalgo to work on Chassis 2 in addition to Chassis 3. (Tr. Hidalgo, 921:20-922:13; Exs. 89, 90, 91, 93, 113; Tr. Tabak, 276:19-21, Ex. 85.) Evidence was also introduced that Hidalgo was performing work on Chassis 1 during this time period. (*See* Ex. 113.)

On January 8, 2015, toward the end of Hidalgo's six-week PIP period, Hidalgo sent an e-mail to Jeremy Ball and Tabak regarding an overhead conveyor system carrier, which moved vehicles to various stations throughout the chassis line. Hidalgo attached a photo to his e-mail and stated: "Attached is a photo of carrier T2-T-30 with vehicle not seated correctly. Pad needs to be further to the right. There are at least three carriers with this problem (we are making them as we find them). Associate noticed the problem when vehicle slid into position while he was installing airline in the general vicinity. Can we re-teach robot at transfer for these particular carriers pronto?" (Exs. 9.) Hidalgo admitted at the arbitration hearing that he did not do any investigation into this seating problem or determine the problem's root cause. (*See* Tr. Hidalgo, 1035:19-25.)

In early- to mid-February a similar seating issue arose, about which Hidalgo was informed by another Tesla employee. (Ex. 13.) Hidalgo immediately forwarded the e-mail he received from the employee to maintenance. He again did not try to analyze or solve the problem. Maintenance then asked Hidalgo for the root cause of the problem. Hidalgo responded that he had not investigated or determined the root cause. He did, however, recommend re-teaching the robot. (*Id.*)

Shortly after forwarding his e-mail to maintenance, Hidalgo forwarded the same e-mail to Tesla's Environmental Health and Safety ("EHS"), reporting the carrier issue as a "safety concern." (Ex. 14.) Kyle Rowe ("Rowe"), Environmental Health & Safety Engineer, responded to Hidalgo's e-mail and met with him at the location where the carrier issue was allegedly occurring on February 10, 2015. (Exs. 14-15.) Hidalgo was not able to demonstrate the safety issue to Rowe when they met, however.  (Tr. Rowe, 430:6-4313:2.) This was because the carrier issue had actually already been resolved. (Ex. 16.)

Following their meeting, Rowe sent an e-mail to Hidalgo and maintenance, copying Tabak, Gross and Josh Ensign, the then VP of Manufacturing, acknowledging that a safety issue had been raised. (Ex. 16; Tr., Rowe 426:11-17.) Rowe did not do an independent investigation into the alleged safety issue, however, and he was not aware at the time that he sent the e-mail that the issue was resolved. (Tr., Rowe, 426:11-17.) The next day, before he could conduct an independent investigation or consult with any other individuals, Rowe was informed by Hidalgo that the issue had been resolved and that the risk to Tesla employees had been diminished. (Tr. Rowe, 426:19-427:12.)

On February 18, 2015, Tabak decided to terminate Hidalgo's employment. This decision was based on Tabak's opinion that Hidalgo had failed to meet the requirements of his PIP.  It was also based on the fact that toward the end of January, 2015, Hidalgo had been ranked one of the lowest performers in Tabak's group in all three areas of evaluation – performance, potential and pain -- in the Quarterly Talent Review for Q1 of 2015. (*See* Exs. 26-27; Tr., Tabak, 566:2-569:10; Tr. Gross, 764:16-765:7.) Tabak's decision to terminate Hidalgo's employment was premised on his view that the many bottlenecks in production/manufacturing that had continued and the inefficiencies within areas for which Hidalgo was responsible, were all causing

DocuSign Envelope ID: 11A4284E-8476-4D1A-B0D8-08D619550C54

significant disruptions in the production of the Model S. At the termination meeting, Tabak told Hidalgo that he was terminating him for performance reasons. (Tr. Tabak, 384:14-17.)

Throughout Hidalgo's tenure at the company, Tesla's production goals were very high, only increased over time, and were quite demanding. Given absences and reassignments, Tesla engineers were expected to work long hours. I have little doubt that Hidalgo's was a high stress job. Hidalgo credibly testified on the toll all these demands took on him.

After his termination, Hidalgo found alternative employment at Nemo Building, through Balanced Staffing, where his annual salary was $90,000. (Tr. Hidalgo, 990:9-991:10.) Hidalgo worked at Nemo Building from September, 2015 to April, 2016, at which time he voluntarily terminated his employment. (Tr. Hidalgo, 990:16-991:10.) Hidalgo decided to retire in June, 2018 (Tr. Hidalgo, 472:8-11.)

## III.   DISCUSSION

As noted, *supra*, the following causes of action remain in these proceedings: (1) violation of Cal. Gov. Code §12940(a) – based on age and race; (2) intentional infliction of emotional distress (3) wrongful termination in violation of public policy; and (4) violation of Cal. Labor Code §1102.5. Each of these will be addressed below.

### A.   *Violation of Cal. Gov. Code §12940(a) based on age and race*

> California Government Code section 12940(a) states, in relevant part:
> It is an unlawful employment practice . . . (a) For an employer, because of the race . . . age . . . of any person, to . . . discharge the person from employment . . . .

(Cal.Govt. Code §12940(a).)

A plaintiff can prove discrimination under the FEHA with either direct or circumstantial evidence. (*Achal v. Gate Gourmet* (N.D. Cal. July 14, 2015) 114 F. Supp. 3d 781, 801.) In the

absence of direct evidence, such as the case here, California courts analyzing FEHA claims have adopted the burden-shifting analytical framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802.

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case by showing (1) he was a member of a protected class; (2) he was qualified for the position he sought or was performing competently in the position he held; (3) he suffered adverse employment action; and (4) some other circumstances suggesting a discriminatory motive. (*Guz v. Bechtel Nat'l, Inc.* (2000) 24 Cal.4th 317, 355.) If a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to proffer a legitimate, non-discriminatory reason for its employment decision. (*Id.* at 355-56.) Once that burden is met, the plaintiff must prove that the employer's proffered reason is not legitimate but was actually a pretext for unlawful discrimination. (*Id.*).

Here, Hidalgo cannot prove his *prima facie* case. While Hidalgo was without a doubt a member of a protected class – he is 61 years old and Hispanic, and he undoubtedly suffered an adverse employment action when he was terminated, he has failed to meet his burden of producing any evidence that would suggest that there was some discriminatory motive relating to his age or race that lead to his termination. Indeed, Hidalgo introduced absolutely no evidence demonstrating that his age or his race were at all factors in his termination.[10] The mere fact that he falls within a protected class is insufficient to create an inference of age or race discrimination.

---

[10] During his testimony, Hidalgo did explain that he was referred to as "grandpa," "old man," and "senile old man" by some of his co-workers. (*See* Tr. Hidalgo, 960:10-962:5.) These co-workers were not a part of Tesla's management, however, and no evidence was introduced showing that Hidalgo complained to management about being called these names. In fact, no evidence was introduced connecting these comments to his employment termination whatsoever. The comments, therefore, are not dispositive of or at all relevant to Hidalgo's FEHA age-based discrimination claim.

Moreover, even if Hidalgo had proven his *prima facie* case, as discussed, *supra*, Tesla has set forth more than sufficient evidence demonstrating that Hidalgo was terminated for legitimate business reasons. Hidalgo's supervisor – Tabak – testified credibly that, in his opinion, Hidalgo consistently failed to maintain the manufacturing equipment for which he was responsible, causing substantial bottleneck in the manufacturing/production line. As a result, other engineers were required to cover for him and complete his assignments. These behaviors led to the issuance of the PIP. Hidalgo then failed to meet the areas of improvement that the PIP set forth. The evidence supports the finding that these are the legitimate, non-discriminatory factors that influenced Tesla's termination decision.

Hidalgo argues that Tabak's point of view with regard to his performance was incorrect – that his job performance was satisfactory; indeed, that it went above and beyond what a reasonable employer should have expected and that he was being held responsible for issues that arose in the workplace that were beyond his control. Even if what Hidalgo argues is true, as the court in *Guz* suggests, so long as Tabak's (and therefore, Tesla's) rationale for the termination decision is nondiscriminatory, it need not necessarily be wise or correct. (*Guz*, *supra*, 24 Cal.4th at 358.) "While the objective soundness of an employer's proffered reasons supports their credibility . . . the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*. Thus, "legitimate" reasons in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*." (*Id*. [emphasis in original] [internal citations omitted] [citing *Kariotis v. Navistar Intern. Transp. Corp.* (7th Cir. 1997) 131 F.3d 672, 676 [suggesting that proffered reasons, if "nondiscriminatory on their face" and "honestly believed" by employer, will suffice even if "foolish or trivial or baseless"]; *McCoy v. WGN Continental Broadcasting Co.* (7th Cir. 1992) 957 F.2d 368, 373 [ultimate issue is whether employer "honestly believed in the reasons it

13

offers"]; and *Fuentes v. Perskie* (3d Cir. 1994) 32 F.3d 759, 765 [issue is discriminatory animus, not whether employer's decision was "wrong or mistaken," or whether employer is "wise, shrewd, prudent, or competent"].)

The evidence introduced at the hearing did not demonstrate that Tabak had a discriminatory motive. He merely had a different view from Hidalgo on whether Hidalgo was doing his job and making appropriate workplace decisions. For example, Tabak blamed Hidalgo for engineering issues that contributed to decreased productivity. Hidalgo contends, however, that such decrease was explained by the line not being fully equipped to produce the number of cars demanded and the engineering department being severely understaffed.  (*See* Kalisch Depo., 47:11-48:24; 44:8-45:5; 29:21-30:16; 34:19-35:8; 43:18-23.) And even if Tabak was improperly criticizing Hidalgo for issues that were not necessarily Hidalgo's fault, this does not add up to a finding that Tabak's motive was improper. As the cases cited, *supra*, explain, criticisms that are unfair or unwarranted do not equate to a finding of an improperly motivated decision.

Finally, in response to Tesla's proven legitimate, non-discriminatory reason for his termination, Hidalgo failed to prove, by a preponderance of the evidence, that Tesla's reasons were a pretext for race or age discrimination. Again, throughout the four-day arbitration hearing, no evidence was introduced connecting Hidalgo's age and/or race to Hidalgo's termination in any way. Hidalgo, therefore, has failed to prove either his race- or age- based FEHA claims.

B.  *Intentional infliction of emotional distress*

To prove a claim for intentional infliction of emotional distress, Hidalgo must show that (1) Tesla engaged in extreme and outrageous conduct; (2) Tesla intended to cause, or recklessly disregarded the probability of causing, emotional distress; (3) he had severe emotional suffering; and (4) Tesla's actions were the actual and proximate cause of his emotional distress. (*See*

DocuSign Envelope ID: 11A4284E-8476-4D1A-B0D8-08D649550C54

*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1007.) Hidalgo has failed to prove this cause of action.

Tesla's (and Tabak's) actions were not extreme or outrageous. Yes, Hidalgo was offered a PIP and was given some verbal warnings by Tabak, but discipline and criticism are a normal part of the employment relationship; they are not grounds for an IIED claim. (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 25.) "Managing personnel is not outrageous conduct beyond the bounds of human decency but rather conduct essential to the welfare and prosperity of society." (*Janken v. GM Hughes Elecs.* (1996) 46 Cal.App.4th 55, 80.) In order for conduct to be considered "outrageous," it must be so extreme as to exceed all bounds of that usually tolerated in a civilized society." (*Vasquez v. Franklin Mgmt. Real Estate Fund, Inc.* (2012) 222 Cal.App.4th 819, 832.) Neither Tesla's nor Tabak's conduct meets this standard.

Further, Hidalgo has failed to show that, even if he suffered some emotional distress, that that distress was severe. (*See Crouch*, *supra*, 39 Cal.App.5th at 1007.) While Hidalgo testified that he felt sad and despondent after he was terminated and that his "self-esteem [and self-worth] suffered," he later testified that he never sought medical treatment or took any prescription medication for any emotional distress associated with Tesla's conduct because he knew that he would eventually finish "the grieving process" and his termination was not be "the end of the world." (*See* Tr. Hidalgo, 955:24-958:3; 10461-6.) Indeed, Hidalgo testified that after his termination he continued to exercise to relieve his stress and anxiety, and he cared for his new grand-daughter to help him feel better. (*Id.*, 958:8-959:7.) And while Hidalgo did complain of eating and sleeping issues following his termination, assertions of "discomfort, worry, anxiety, upset stomach, concern, and agitation" "do not comprise emotional distress of such substantial quality or enduring quality that no reasonable person in civilized society should be expected to endure it." (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1051.)

15

For all of these reasons, Hidalgo has failed to prove his intentional infliction of emotional distress claim.

## C. *Wrongful termination in violation of public policy*

To recover in tort for wrongful discharge in violation of public policy, Hidalgo must show that Tesla violated a public policy affecting "society at large rather than a purely personal or proprietary interest of the plaintiff or employer." (*Holmes v. Gen. Dynamics Corp.* (1993) 17 Cal.App.4th 1418, 1426.) The policy at issue must be substantial, fundamental, and grounded in a statutory or constitutional provision. (*Id.*)

Here, as I discussed above and will discuss further below, Hidalgo has not prevailed on any of his statutory claims against Tesla. Because a wrongful termination claim requires the alleged policy violation to be "tethered to fundamental policies delineated in constitutional or statutory provisions," without such a tether, Hidalgo's wrongful termination claim does not succeed. (*See Green v. Ralee Eng. Co.* (1998) 19 Cal.4th 66, 74.)

## D. *Violation of Cal. Labor Code §1102.5*

California Labor Code section 1102.5 protects an employee from retaliation by his employer for making a good faith disclosure of a violation of state or federal law. (Cal.Lab.Code §1102.5(b); *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384.) An employee need not prove an actual violation of law; it suffices if the employer fired him for reporting his "reasonably based suspicions" of illegal activity. (*Green*, *supra*, 19 Cal. 4th 66, 87.) Section 1102.5 reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation. (*Id*. at 77.)

The *McDonnell Douglas* burden-shifting framework applies to section 1102.5 claims. (*Sillah v. Command International Security Servs.* (N.D.Cal. 2015) 154 F.Supp.3d 891, 916-17.)

And "once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." (Cal.Lab.Code §1102.6.)  A "contributing factor" is any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision. (*Frost v. BNSF Ry. Co.* (9th Cir. 2019) 914 F.3d 1189, 1195.) To make a *prima facie* showing under section 1102.5, Hidalgo must show that: (1) he engaged in protected activity; (2) he was subject to an adverse employment action; and (3) there was a causal link between elements (1) and (2). (*Mokler v. Cnty. of Orange* (2007) 157 Cal.App.4th 121, 138.)

Hidalgo alleges that he was terminated for complaining about a vehicle shifting issue that impacted safety and for complaining about the number of hours worked. The hours worked claim under the facts asserted here does not rise to a violation of section 1102.5. The vehicle shifting issue is a much closer call and probably does rise to a violation.

First, at least with regard to Hidalgo's hours-worked claim, this claim does not amount to the "protected activity" necessary for Hidalgo to prove his *prima facie* case. When asked at his deposition if he could identify any law or rule or policy prohibiting employers in California from having exempt employees work seven days a week, he responded, "I cannot." (Hidalgo Depo., 368:12-20.) Thus, even though Hidalgo need not prove an actual violation of law, he has not even demonstrated that he had "reasonably based suspicions" that his working hours constituted illegal activity. (*See Turner v. City & Cty. of SF* (N.D. Cal. 2012) 892 F. Supp.2d 1188, 1199-200 ["To have a reasonably based suspicion of illegal activity, the employee must be able to point to some legal foundation for his suspicion—some statute, rule or regulation which may

have been violated by the conduct he disclosed," citing *Love v. Motion Indus., Inc.* (N.D.Cal. 2004) 309 F.Supp.2d 1128, 1135, which concluded that, without citing to "any statute, rule or regulation that may have been violated by the disclosed conduct," plaintiff lacked "any foundation for the reasonableness of his belief"].) While, theoretically, excessive work hours could give rise to a colorable claim of unsafe working conditions in violation of California law, the evidence presented in the case falls woefully short of meeting that level of proof.

Moreover, no evidence was introduced at the hearing indicating that Hidalgo ever complained to Tabak about the number of hours that he worked. Hidalgo vaguely testified about a passing comment he made to Gilbert Passin ("Passin"), a member of Tesla's management team, about his hours. (Tr. Hidalgo, 1003:9-1004:2.) But Passin had no control over the terms of Hidalgo's performance; he was not his direct superior. Having failed to demonstrate that he actually complained about his work hours or that he ever had a reasonable suspicion that his hours worked implicated a violation of the law, Hidalgo has failed to prove his *prima facie* case.

Second, with regard to the carrier issue, while Hidalgo arguably engaged in protected activity when he sent the e-mail noting his "safety concern" to EHS in early February, 2015, (*see* Tr. Hidalgo, 442:23-443:12; 929:1-9[11]; 936:3-13), he has not shown a causal link between this e-mail and his termination, thereby failing to prove his *prima facie* case. Tabak testified that he was not at all upset about the carrier issue e-mail; the carrier issue was a common occurrence at Tesla and, according to Tabak, it was Hidalgo's job duty to fix it. (*See* Tr. Tabak, 341:23-350:10; 590:17-591:12.) He also testified that it was common occurrence for EHS to be in communication with him and his team regarding potential safety issues so this e-mail from EHS

---

[11] Hidalgo identified the safety risk he was reporting as follows:

> The safety risk was at Pre-Trim 3. And the risk was potential injury, severe injury to the associates should the car slip into position. It was out of position. If it slipped into position, it could sever fingers, and as Kyle Rowe pointed out, potential contusions.

was not unusual in his work day. (*Id.*; *see also* Tr. Tabak, 332:15-19.) And while the carrier issue was mentioned in the Performance History section of Hidalgo's PIP, it was not mentioned because Hidalgo had raised it as a concern. It was mentioned because Tabak expected Hidalgo to troubleshoot the issue and solve the problem, not pass the buck directly to someone in maintenance. Its presence in the PIP, therefore, does not link a protected health and safety complaint about the carrier to Hidalgo's termination.

There are no facts in the record connecting the dots between the carrier issue e-mail and Hidalgo's termination; any connection between the two is instead based purely on speculation. But a section 1102.5 claim cannot prevail based solely on conjecture, however. (*See Morgan v. Regents of Univ. of Cal.* (2000) 88 Cal.App.4th 52, 71 [rejecting assertion that testimony reflected discriminatory intent when assertion was based on mere speculation].) As such, Hidalgo's claim based on his carrier concerns e-mail cannot succeed.

All that said, even if Hidalgo had proven his *prima facie* case and established by a preponderance of the evidence that his e-mail was a contributing factor in Tesla's termination decision, the fact of the matter is that Tesla has met its burden of proof to demonstrate by clear and convincing evidence that Hidalgo's termination would have occurred for legitimate, independent reasons (*i.e.*, Hidalgo was not performing his job adequately as represented in his PIP and in conversations with Tabak) even if Hidalgo had not sent the e-mail. (*See, e.g.*, Tr. Tabak, 367: 20-368:13.) The clear and convincing standard does not require Tesla to prove that its decision to terminate Hidalgo's employment was wise or correct or even that Tabak's assessment of Hidalgo's performance was without dispute. This standard merely requires the evidence to be "so clear as to leave no substantial doubt" and "sufficiently strong to command the unhesitating assent of every reasonable mind" that Tesla's decision to terminate Hidalgo was based on legitimate non-discriminatory reasons. (*See Butte Fire Cases* (2018) 24 Cal.App.5th

19

1150, 1158.) Based on the evidence adduced at the arbitration hearing, Tesla has met this standard here.

Hidalgo contends that Tesla has not met its burden, challenging the reliability of the PIP by arguing that Tabak did not properly administer the PIP and the PIP was possibly completed after Hidalgo's termination. I find both of these arguments unpersuasive. The testimony was clear that at the time of Hidalgo's PIP, Tesla had no clear guidelines on how a PIP should be administered. (*See, e.g.,* Tr. 783.) Tabak, therefore, had no specific standards to follow, but his efforts were not inadequate. He wrote a PIP that clearly set forth Hidalgo's deficiencies as he believed them to be and that then gave Hidalgo specific direction on how he could improve those deficiencies within the PIP's six-week time frame.

Further, Tesla's HR department did not require managers to contemporaneously document their meeting notes on the PIP itself. Instead, HR was okay with managers providing such information at the end of the PIP period. (Tr. Washington, 781:1-11.) Thus, there was no requirement that Tabak contemporaneously fill in his observations of Hidalgo's progress in the PIP. No inference can be drawn from the fact that he transferred his own personal notes into the PIP document at a later date.

As I noted earlier when discussing Hidalgo's discrimination claim, while I may believe that Tabak's demands on Hidalgo were not entirely reasonable, I nevertheless find his reasons for deciding to terminate Hidalgo both honest and not retaliatory. It is not my role to second guess a management decision, even if I disagree with it. Instead, my role is to find if it was in any way infected by an improper motive, such as retaliation for disclosure of a violation of the law, and I do not so find in this case. Any connection between the Hidalgo's safety complaint and his termination is based purely on speculation.

Hidalgo has failed to prove sufficient facts to prevail on his section 1102.5 claim, and in particular, that his raising issues with respect to the vehicle shifting issue played any part in the decision to terminate his employment. This claim, therefore, fails.

## IV.    CONCLUSION

I strongly believe that what happened here was a clash of management styles and expectations in a workplace that placed very high—perhaps unreasonable—demands on a conscientious employee who was doing everything he could to perform his duties.

Even if the demands were unrealistic, or, perhaps, even unreasonable, and Tesla treated Hidalgo unfairly, that does not suffice to find in Hidalgo's favor as his burden was to show that an unlawful reason—-a health and safety complaint or his age or race—-was a substantial motivating factor in his termination.

Because Hidalgo has failed to meet his burden, all of his causes of action fail.


DATE:          July 31, 2020


DocuSigned by:

*Michael Loeb*

4983A54F9F7B4BF...

Michael J. Loeb
Arbitrator

## <u>PROOF OF SERVICE BY E-Mail</u>

Re: Hidalgo, Walter vs. Tesla Motors, Inc.
Reference No. 1100085655

I, Elizabeth Magana, not a party to the within action, hereby declare that on  July 31, 2020, I served

the attached FINAL AWARD on the parties in the within action by electronic mail at San Francisco,

CALIFORNIA, addressed as follows:

Alexander Hernaez Esq.
Lucy Li Esq.
Fox Rothschild LLP
345 California St.
Ste 2200
San Francisco, CA   94104
Phone: 415-364-5540
ahernaez@foxrothschild.com
lli@foxrothschild.com
    Parties Represented:
    Tesla Motors, Inc.

Shahane Maritrosyan
Stephan Filip PC
100 W. Broadway
Suite 1040
Glendale, CA   91210
Phone: 323-303-3533
shahane@airapetianlaw.com
    Parties Represented:
    Walter Hidalgo

Matthew E. Faler Esq.
Consumer Action Law Group, P.C.
3700 Eagle Rock Blvd.
Los Angeles, CA   90041
Phone: 818-254-8413
matt@calgroup.org
    Parties Represented:
    Walter Hidalgo

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco,

CALIFORNIA on  July 31, 2020.

_____
Elizabeth Magana
JAMS
EMagana@jamsadr.com

**PROOF OF SERVICE**

I am employed in the County of San Francisco, State of California. I am over the age of eighteen years and not a party to this action. My business address is: Fox Rothschild LLP, 345 California Street, Suite 2200, San Francisco, CA 94104.

On August 14, 2020, I served the following document(s):

**JOINT UPDATE RE: STATUS OF ARBITRATION**

on the interested party(ies) in this action by placing true copies thereof enclosed in sealed envelope(s) addressed as follows:

Shahane Martirosyan, Esq.
Stephan Filip PC
100 W. Broadway, Suite 1040
Glendale, CA 91210
Email: shahane@airapetianlaw.com

☑ **[BY EMAIL]:** I electronically served the above document(s) from phenderson@foxrothschild.com to the email address of the addressee(s) listed above.

☐ **[BY FIRST CLASS MAIL]:** I placed the envelope for collection and mailing following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

☐ **[BY MESSENGER]:** I served the documents by placing them in an envelope or package addressed to the persons at the address listed above and providing them to a professional messenger service for service.

☐ **[BY FACSIMILE]:** I caused said document(s) to be faxed to the facsimile number(s) above.

☐ **[BY OVERNIGHT DELIVERY]:** I caused said document(s) to be deposited at an overnight delivery facility, addressed to the above-listed person(s) for delivery the next business day.

☑ **[STATE]** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 14th day of August 2020, at San Francisco, California.

/s/ *Paulette Henderson*
Paulette Henderson